# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GREGORY STARK, et al.,                    CASE NO. 1:20-CV-01254

                        Plaintiffs,

        -vs-                              JUDGE PAMELA A. BARKER

KEYCORP, et al.,

                        Defendants.       MEMORANDUM OF OPINION AND
                                          ORDER

This matter comes before the Court upon the Motion to Dismiss the Amended Complaint ("Motion to Dismiss") of Defendants KeyCorp ("Key") and the Trust Oversight Committee (the "Committee") (collectively, "Defendants"). (Doc. No. 19.) Plaintiffs Gregory Stark, William Gaff, Michael Lewin, Kimberly Zahr, and Dwight Kurek (collectively, "Plaintiffs") filed a brief in opposition to Defendants' Motion to Dismiss on November 4, 2020, to which Defendants replied on December 4, 2020. (Doc. Nos. 21, 23.) For the following reasons, Defendants' Motion to Dismiss (Doc. No. 19) is GRANTED IN PART and DENIED IN PART.

## I.    Background

### a.  Factual Allegations

#### i.  The Plan

Key is a bank-based financial services company headquartered in Cleveland, Ohio. (Doc. No. 17 at ¶ 24.) Through its subsidiaries, including KeyBank National Association ("KeyBank"), Key provides a wide array of banking, investment, and financial services across the country. (*Id.*) In 1979, Key established its 401(k) Savings Plan (the "Plan"). (*Id.* at ¶ 17.) The Plan is a defined contribution plan, meaning participants' benefits are limited to the value of their own investment

accounts, which is determined by the market performance of employee and employer contributions, less expenses.  (*Id.* at ¶¶ 4, 18.)

Key's employees have the option to invest in the Plan on a tax-deferred basis.  (*Id.* at ¶ 22.) Key also matches employees' contributions to their accounts under certain circumstances.  (*Id.* at ¶¶ 22, 45 n.9.)  Plan participants may only invest among the investment options on the Plan's investment menu, which are selected by the fiduciaries of the Plan.  (*Id.* at ¶ 23.)  One of the fiduciaries of the Plan is Key, which is the plan sponsor and administrator and has ultimate decision-making authority with respect to the management and administration of the Plan and the Plan's investments.  (*Id.* at ¶¶ 25-26.)  Key also has designated the Committee to assist with the administration of the Plan.  (*Id.* at ¶ 29.)  The Committee has the duty to select, monitor, evaluate, and modify the Plan's investments, subject to the ultimate oversight and discretion of Key.  (*Id.*)  Key is responsible for appointing and removing Committee members.  (*Id.* at ¶ 83.)  The Committee and its members also are fiduciaries of the Plan.  (*Id.* at ¶¶ 29-30.)

From 2014 to 2018, the Plan has had between 21,000 and 29,000 participants and between $1.8 billion and $2.9 billion in assets, making it one of the 300 largest defined contribution plans in the United States out of more than 650,000.  (*Id.* at ¶¶ 21, 43.)  Plaintiffs either presently participate in the Plan or were participants in the Plan at various points in time from 1998 to the present.  (*Id.* at ¶¶ 12-16.)

### ii.  Administrative Fees

Defined contribution plans typically engage vendors to provide administrative services necessary for the operation of a plan, such as recordkeeping, trustee, and custodial services.  (*Id.* at ¶

40.)  Providing for these administrative services is one of a plan's largest expenses, although the costs of these services are typically borne by the plan participants.  (*Id.* at ¶¶ 40-41.)

Generally, service providers charge plans for recordkeeping and related administrative services either on a per-participant fee basis (a fee based on the number of participants in the plan) or as an asset-based fee (a fee based on a percentage of the total assets in the plan).  (*Id.* at ¶ 41.)  Asset-based fee arrangements are more common for smaller defined contribution plans, which have less leverage to negotiate how services are charged.  (*Id.*)  Conversely, plans with large numbers of participants can take advantage of economies of scale to negotiate lower per-participant administrative fees.  (*Id.* at ¶ 43.)  In addition, among larger plans, the market for recordkeeping and related administrative services is highly competitive, with many vendors equally capable of providing a high-level of service.  (*Id.* at ¶ 42.)  Accordingly, vendors vigorously compete for business by offering the best price.  (*Id.*)  As a result of such competition, recordkeeping and related administrative fees have declined in defined contribution plans over time.  (*Id.*)  Between 2006 and 2016, recordkeeping and related administrative costs in the marketplace have dropped by approximately 50% on a per-participant basis.  (*Id.*)

Alight Financial Solutions LLC and its predecessors ("Alight") provided administrative services for the Plan from 2003 until 2020.  (*Id.* at ¶¶ 12 n.1, 44.)[1]  Alight also administers Key's pension and retiree medical plans and has played an integral role in setting up and administering KeyBank's online HR portal through which all employee benefits are managed, among other things.

---

[1] Key switched to using Fidelity Investments as a recordkeeper on July 1, 2020, less than a month after the original Complaint was filed.  (Doc. No. 17 at ¶ 44 n.7.)

3

(*Id.* at ¶ 44.)  The costs of providing these pension plan, medical plan, and HR services are Key's responsibility and are not borne by the Plan or its participants.  (*Id.*)

The Plan's fee disclosures from 2015, 2016, 2019, and 2020 show that eligible participants in the Plan were charged $63 per year for Alight's recordkeeping and related administrative services. (*Id.* at ¶ 45.)  A rigorous benchmarking analysis or request for proposal would have revealed that the Plan could have obtained the same services at a lower cost.  (*Id.* at ¶ 46.)  Specifically, a similarly sized plan could have obtained comparable recordkeeping and related administrative services in terms of scope and quality for approximately $30 to $40 per participant from vendors such as Vanguard, Fidelity, or Alight, among others.  (*Id.* at ¶ 45.)

### iii.  Managed Account Fees

In addition to hiring administrative service providers, plans also may hire a managed account provider that participants can elect to manage their accounts for an additional fee.  (*Id.* at ¶ 48.)  To provide a managed account service to plan participants, a plan sponsor can directly contract with a managed account provider or can use an intermediary service provider, such as the plan's recordkeeper, who then employs a managed account provider as a sub-adviser.  (*Id.* at ¶ 49.)

From 2010 until 2014, the Plan directly contracted with Financial Engines to serve as its managed account provider.  (*Id.* at ¶ 53.)  In 2014, the Plan started using its recordkeeper, Alight, as an intermediary who then employed Financial Engines as a sub-adviser.  (*Id.*)  Alight served as the intermediary until July 1, 2020, when Defendants switched recordkeepers.  (*Id.*)  Participants who elected to have their accounts managed by Alight and Financial Engines were charged an additional fee based on the value of their accounts.  (*Id.* at ¶ 54.)  Those participants incurred a fee of 0.60% of

assets up to $100,000, 0.45% of assets between $100,001 and $250,000, and 0.30% of assets greater than $250,000. (*Id.*)[2]

These fees were higher than what Alight charged other plans for identical managed account services from Financial Engines. (*Id.*) For example, in 2015, the JCPenney 401(k) Savings Plan also used Alight as a recordkeeper, but paid less for the same Financial Engines managed account service: 0.35% of assets up to $100,0000, 0.25% of assets between $100,001 and $250,000, and 0.10% of assets greater than $250,000. (*Id.* at ¶ 55 (table)). The Caterpillar 401(k) Retirement Plan's managed account fees in 2016 were similar: 0.40% of assets up to $100,000, 0.30% of assets between $100,001 and $250,000, and 0.20% of assets greater than $250,000. (*Id.*)

The Plan's managed account service also was more expensive than the same Financial Engines managed account service offered by other recordkeepers as the intermediary, such as Vanguard. (*Id.* ¶ 58.) For example, participants in the AGFA Healthcare Corporation Employee Savings Plan used Vanguard as a recordkeeper and paid between 15 to 20 basis points less for Financial Engines' managed account service: 0.40% of the balance per year for the first $100,000, 0.30% of the balance per year for the next $150,000 in a participant's account, 0.20% of the balance per year for the next $250,000 in a participant's account, and 0.10% of the balance per year for amounts over $500,000 in a participant's account. (*Id.*)

Had Defendants paid closer attention to managed account fees, they could have used this information to negotiate lower rates for Financial Engines' managed account service. (*Id.*) Instead, Defendants caused participants to pay an off-the-shelf price, which was the highest fee for the

---

[2] When Key switched recordkeepers in July 2020, shortly after the original Complaint was filed, the managed account service fees decreased to 0.35% of assets up to $100,000, 0.30% of assets between $100,001 and $250,000, and 0.25% of assets greater than $250,000.

managed account service offered by Alight.  (*Id.* at ¶ 57.)  Plaintiff Dwight Kurek has been enrolled in the Plan's managed account service.  (*Id.* at ¶ 16.)

### iv.  KeyBank EB MaGIC Fund

Another one of the investment options offered by the Plan is the KeyBank EB MaGIC Fund (the "MaGIC Fund").  (*Id.* at ¶ 61.)  The MaGIC Fund is a proprietary stable value fund maintained by Key and is the Plan's only stable value fund option.  (*Id.*)  A stable value fund is a low-risk, liquid option designed for capital preservation.  (*Id.* at ¶ 60 n.19.)  Other examples of capital preservation options offered by 401(k) plans include money market funds and guaranteed investment contracts.  (*Id.*)  Stable value funds invest in an underlying portfolio of fixed income securities whose principal is guaranteed by the issuer.  (*Id.*)  Stable value funds typically generate greater yields than other capital preservation options by using longer-maturity securities, while avoiding the associated risk of principal loss by purchasing insurance, or "wrap," contracts from highly rated insurance companies guaranteeing the portfolio against loss of principal.  (*Id.*)

The MaGIC Fund has a total of approximately $600 million in assets.  (*Id.* at ¶ 62.)  During the relevant timeframe, roughly a third of the MaGIC Fund has come from investments from Plan participants, fluctuating between $115 million and $170 million.  (*Id.*)  No other defined contribution plans with over $2 billion in assets invested in the MaGIC Fund.  (*Id.*)  The next largest plan that invested in the MaGIC Fund has less than $250 million in assets and only invested approximately $11 million in the fund.  (*Id.*)

There were other stable value fund options with billions of dollars in assets at comparable levels of risk that were available in the marketplace and would have generated greater returns and lower underlying fees for participants.  (*Id.* at ¶ 63.)  Specifically, over the ten years prior to the end

6

of 2019, the MaGIC Fund averaged an annual return of 2.06%.  (*Id.* at ¶ 64.)  During that same timeframe, fourteen other stable value accounts with at least $50 million in assets that were managed using similar targets for duration and credit quality of the underlying fixed income securities had a composite average of an annual return of 2.57% and outperformed the MaGIC Fund in nine of the ten years.  (*Id.*)

Had Defendants conducted a proper marketplace investigation, they would not have retained the MaGIC Fund as the Plan's stable value fund option.  (*Id.* at ¶ 65.)  Instead, Key improperly used the Plan to try to prop up the MaGIC Fund.  (*Id.* at ¶ 62.)  Plaintiff Kimberly Zahr was a Plan participant that invested in the MaGIC Fund.  (*Id.* at ¶ 15.)

### b.  Procedural History

On June 4, 2020, Plaintiffs Gregory Stark, William Gaff, and Michael Lewin filed a putative class action against Defendants, as well as John Does 1-30, alleging that Defendants breached several of their duties under the Employee Retirement Income Security Act of 1974 ("ERISA") and seeking to represent a class of all participants and beneficiaries of the Plan since June 2014.  (Doc. No. 1.)  After Defendants moved to dismiss the Complaint, Plaintiffs filed an Amended Complaint on August 31, 2020, adding Plaintiffs Kimberly Zahr and Dwight Kurek and new allegations against Defendants. (Doc. Nos. 15, 17.)  The Amended Complaint sets forth two counts under ERISA: (1) breach of the fiduciary duties of prudence and loyalty against all Defendants, and (2) breach of the duty to monitor fiduciaries against Key.  (Doc. No. 17 at ¶¶ 76-88.)  Although it is a single count, Count I of the Amended Complaint contains several different theories regarding Defendants' alleged breaches based on the factual allegations outlined above.  Specifically, Plaintiffs allege that Defendants (1) breached their duties of prudence and loyalty with respect to the payment of excessive administrative

fees, (2) breached their duty of prudence with respect to the payment of excessive managed account fees, and (3) breached their duties of prudence and loyalty with respect to the decision to retain the MaGIC Fund as the Plan's stable value fund option. (*See id.* at ¶¶ 76-81.)

On October 5, 2020, Defendants filed a Motion to Dismiss the Amended Complaint, seeking to dismiss all counts in the Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 19.) Plaintiffs filed a brief in opposition to Defendants' Motion to Dismiss on November 4, 2020, to which Defendants replied on December 4, 2020. (Doc. Nos. 21, 23.)

## II. Standard of Review

Under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *See Gunasekara v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). In order to survive a motion to dismiss under this Rule, "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."'" *Gunasekera*, 551 F.3d at 466 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

## III.  Analysis

### a.  Count I

In Count I, Plaintiffs allege that Defendants committed several breaches of the duties of prudence and loyalty imposed upon them by ERISA, specifically 29 U.S.C. § 1104.  (Doc. No. 17 at ¶¶ 76-81.)  "In order to state a claim under this provision, a plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).  In this case, the parties only dispute whether Plaintiffs have adequately alleged that Defendants breached their fiduciary duties.  Thus, the Court limits its analysis to that issue below.

### i.  Administrative Fees

#### 1.  Duty of Prudence

First,  Plaintiffs  allege  that  the  Plan's  excessive  administrative  fees  demonstrate  that Defendants failed to act prudently to keep administrative expenses at competitive levels.  (*See* Doc. No. 17 at ¶ 47.)  In their Motion to Dismiss, Defendants assert that dismissal of this claim is warranted because Plaintiffs have not alleged any specific failures in Defendants' process for setting the Plan's administrative  fee,  nor  alleged  a  sufficiently  meaningful  benchmark  demonstrating  that  the  Plan's administrative  fee  was  excessive  so  as  to  plausibly  infer  a  process-based  failure.  (Doc. No. 19-1 at 4-9.)  In response, Plaintiffs contend that they are not required to address the process by which the Plan was managed at this stage of the litigation and that they have sufficiently alleged that a prudent fiduciary would not have paid $63 per participant for administrative services, as they have identified three separate vendors that would have provided the same services at significantly lower cost.  (Doc. No. 21 at 5-10.)  Upon review of the parties' arguments, the Court concludes that Plaintiffs have adequately stated a claim in this regard.

"ERISA 'requires the fiduciary of a pension plan to act prudently in managing the plan's assets." *Pfeil v. State Street Bank and Trust Co.*, 806 F.3d 377, 383 (6th Cir. 2015) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 411-12 (2014)).  Specifically, a fiduciary of a plan is required to discharge his duties "solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  "The test for determining whether a fiduciary has satisfied his duty of prudence is whether the individual trustees, at the time they

10

engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Pfeil*, 806 F.3d at 384 (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000)).  Courts must "focus . . . on whether the fiduciary engaged in a reasoned decision[-]making *process*, consistent with that of a prudent man acting in [a] like capacity." *Id.* (quoting *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)).

However, at this stage, "[e]ven when the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden*, 588 F.3d at 596).  Indeed, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598.  Thus, consistent with general pleading standards, a plaintiff's allegations "must give rise to a *reasonable* inference that the defendant committed the alleged misconduct, thus permit[ting] the court to infer more than the *mere possibility* of misconduct," *St. Vincent*, 712 F.3d at 718-19 (internal citations and quotations omitted), but need not "rule out every possible lawful explanation for the conduct he challenges." *Braden*, 588 F.3d at 597.  In sum, "while a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, [courts] must also take account of their limited access to crucial information." *Id.* at 598; *see also St. Vincent*, 712 F.3d at 719 (recognizing that "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times").

With these principles in mind, the Court finds that Plaintiffs' allegations are sufficient to state a claim for the breach of Defendants' duty of prudence with respect to the Plan's alleged payment of excessive administrative fees.  "[A] fiduciary's failure to ensure that record-keepers charged appropriate fees and did not receive overpayments may be a violation of ERISA."  *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1065 (M.D. Tenn. 2018); *accord Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019) (noting that "[f]iduciaries must also understand and monitor plan expenses" since "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan") (citation omitted).  "The question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss."  *Cassell*, 285 F. Supp. 3d at 1064.

As a result, several courts have found dismissal unwarranted based on allegations similar to those present here.  For example, in *Morin v. Essentia Health*, the plaintiffs alleged that the defendants paid excessive recordkeeping fees and detailed the amount paid each year compared to what a reasonable payment would have been, including actual fees of $65 per participant in 2012, while comparable services were available for $45 to $55 per participant, and actual fees of $94 and $88 per participant in 2014 and 2015, respectively, while comparable services were available for $35 to $45 per participant.  No. 16–cv–4397 (RHK/LIB), 2017 WL 4083133, at *3 (D. Minn. Sept. 14, 2017), *report and recommendation adopted*, 2017 WL 4876281 (D. Minn. Oct. 27, 2017).  The court held that the plaintiffs had sufficiently stated a claim for breach of the fiduciary duty of prudence, reasoning:

> The First Amended Complaint alleges that the Plans have a large pool of assets and a high number of participants, that the recordkeeping market is highly competitive, and

12

that despite this competitive market, the fiduciary Defendants have paid higher than reasonable market fees for service packages provided by the Plans' recordkeepers. Further, Plaintiffs allege that comparable or superior recordkeeping services were available at lower cost.  It is possible to reasonably infer from what is alleged that Defendants' process for selecting a recordkeeper, review and retention of recordkeepers, and/or for negotiating fees with recordkeepers was therefore flawed.

*Id.* at *12.

Further, in *Disselkamp v. Norton Healthcare, Inc.*, the plaintiffs asserted the administrative fees charged under the plan were excessive and that the defendants had breached their duty of prudence because a reasonable cost for recordkeeping would have been $50, but the actual cost for participants was in excess of $70.  No. 3:18-CV-00048-GNS, 2019 WL 3536038, at *9 (W.D. Ky. Aug. 2, 2019).  Plaintiffs also alleged that the defendants had failed to engage in a competitive bidding process and failed to ensure that the administrative service provider, who was paid via revenue sharing, did not receive excessive compensation after rapid growth in the plan's assets.  *Id.* at *9-10.  The court denied the defendants' motion to dismiss, rejecting the defendants' argument that the plaintiffs were simply claiming that the defendants had a duty to find the lowest administrative fees available.  *Id.* at *10  Instead, the court held that the plaintiffs' allegation "that the average per participant fee during the relevant period was around $50, whereas the per participant fee for the Norton Plan was around $70" was "sufficient to survive a motion to dismiss."  *Id.*

Similarly, in this case, in support of their claim that Defendants breached their duty of prudence with respect to the payment of excessive administrative fees, Plaintiffs allege that Plan participants were charged $63 per year for recordkeeping and related administrative services, specifically citing to the Plan's fee disclosures from 2015, 2016, 2019, and 2020.  (Doc. No. 17 at ¶ 45.)  Plaintiffs further allege that given the size and bargaining power of the Plan, a prudent fiduciary could have obtained comparable recordkeeping and related administrative services in terms of scope

and quality for approximately $30 to $40 per participant from vendors such as Vanguard, Fidelity, or Alight. (*Id.*)[3] Moreover, Plaintiffs allege that competition in the market for administrative services for large defined contribution plans has caused fees to decline over time. (*Id.* at ¶ 42.)[4] Yet, the per participant fee for the Plan has remained the same since at least 2015. (*See id.* at ¶ 45 n.10.) Finally, Plaintiffs also point out that the Plan grew by approximately 8,000 participants between 2014 and 2018, which should have provided the Plan with greater bargaining power, but Defendants still did not act to reduce participants' fees. (*Id.* at ¶ 21; Doc. No. 21 at 10.) Thus, Plaintiffs have alleged that Defendants caused Plan participants to pay excessive fees when comparable services were available for lower costs and that Defendants failed to reduce those fees over time despite increasing competition in the market and an increase in the Plan's bargaining power from more participants. Although Plaintiffs do not directly address the process by which Defendants controlled the Plan's administrative expenses, based on these allegations, it is reasonable to infer that Defendants' process was flawed and that they failed to prudently monitor the Plan's administrative expenses to keep administrative expenses at competitive levels, and thereby breached their fiduciary duty of prudence.

Defendants contend Plaintiffs' allegations are barebones and insufficient because they have not established a meaningful benchmark showing that the Plan's administrative expenses were

---

[3] In their opposition to Defendants' Motion to Dismiss, Plaintiffs cite to a variety of material outside of the pleadings in support of their contention that these three vendors, as well as T. Rowe Price, charged similarly sized plans significantly less than $63 per participant for their services. (Doc. No. 21 at 6-7.) However, Plaintiffs have not explained why the Court's consideration of such material at the motion to dismiss stage is appropriate, and Plaintiffs "cannot . . . amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). Consequently, the Court will not consider this new evidence.

[4] One of the studies cited by Plaintiffs in their Amended Complaint illustrating this decline in fees indicates that the median fee per participant was $59 in 2017. (Doc. No. 17 at ¶ 42 n.6.) Defendants use this figure to argue that Alight's fee of $63 per participant was therefore reasonable. (Doc. No. 19-1 at 7-8.) However, that study involved defined contribution plans with a median size of 6,705 participants, which is significantly less than the number of participants enrolled in the Plan. (Doc. No. 21-8 at 3.) Thus, the Court is not persuaded that this wholly undermines Plaintiffs' claim.

excessive, but the principal cases relied on by Defendants in support of this argument are distinguishable. (Doc. No. 19-1 at 5-7.) For instance, in several cases cited by Defendants, the plaintiffs failed to identify alternative administrative service providers that would have provided the same services for less. *See Divane v. Northwestern Univ.*, 953 F.3d 980, 991 (7th Cir. 2020) ("Plaintiffs have identified no alternative recordkeeper that would have accepted such a low fee or any fee lower than what was paid to Fidelity and TIAA."); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685 (ALC), 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("Plaintiff did not compare the Plan's record keeping service to an alternative a prudent fiduciary would have selected or provide any additional facts to support their assertion that the administrative fees were excessive."); *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *15 (N.D. Cal. Aug. 29, 2016) (granting motion to dismiss where the plaintiffs "alleged no facts suggesting that the Plan fiduciaries could have obtained less-expensive recordkeeping services" and failed to even identify the amount of the recordkeeping fees charged).

Other cases relied on by Defendants involved alleged excessive expense ratios on specific funds offered as investment options by plans, not the administrative fees charged. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (affirming dismissal of claim because "alleging that cheaper alternative investments with *some* similarities exist in the marketplace" was insufficient to establish a meaningful benchmark); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."). In contrast, here, Plaintiffs have alleged that Defendant could have obtained comparable administrative services at a significantly reduced cost from at least three different vendors and that a prudent fiduciary would have discovered this and taken advantage of the cost savings.

15

Defendants also take issue with the comparator vendors identified by Plaintiffs because two of those vendors are Alight—whose fees prompted this lawsuit to begin with—and Fidelity, the Plan's new recordkeeper.  (Doc. No. 19-1 at 7.)  However, the Court agrees with Plaintiffs that the fact that Defendants negotiated a rate of $63 per participant from Alight does not mean that a prudent fiduciary would have negotiated the same rate.  (Doc. No. 21 at 7 n.12.)  And the same is true of Fidelity even if the Plan's administrative fees have remained the same since the switch from Alight to Fidelity.  Nor is Defendants' argument that Plaintiffs failed to explain how Vanguard—the third vendor identified by Plaintiffs—could have provided the necessary level of services persuasive (Doc. No. 19 at 7), as Plaintiffs specifically allege it could have provided comparable recordkeeping and related administrative services in terms of scope and quality (Doc. No. 17 at ¶ 45).  Finally, Defendants assert Plaintiffs have failed to specifically identify the bundle of administrative services provided by Alight that might justify the higher costs (Doc. No. 23 at 3-4), but Plaintiffs are not required to rebut "all possible lawful explanations for a defendant's conduct."  *Braden*, 588 F.3d at 596.

Accordingly, Defendants' Motion to Dismiss is denied with respect to Plaintiffs' claim based on Defendants' alleged breach of the duty of prudence with regard to the payment of excessive administrative expenses.

### 2.  Duty of Loyalty

In their Amended Complaint, Plaintiffs also set forth a claim for breach of the duty of loyalty with respect to the alleged excessive administrative fees.  Specifically, Plaintiffs allege that it can be inferred that Defendants allowed participants to be charged excessive fees in exchange for discounts on the other services Alight was providing to Key that Key itself should have been responsible for

16

paying.  (Doc. No. 17 at ¶¶ 47.)  Defendants argue that no allegations in the Amended Complaint support this assertion and that it is pure speculation.  (Doc. No. 19-1 at 9-10.)  Plaintiffs admit that further discovery will be necessary to further explore Key's contracting arrangements with Alight, but assert that their allegations are sufficient to support a breach of loyalty claim at this stage.  (Doc. No. 21 at 19-20.)  The Court agrees with Defendants that Plaintiffs have failed to adequately state a claim for a breach of the duty of loyalty with respect to the Plan's administrative fees.

The duty of loyalty imposed by ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  "[T]he duty of loyalty is unequivocal."  *Karpik v. Huntington Bancshares Inc.*, No. 2:17-cv-1153, 2019 WL 7482134, at *4 (S.D. Ohio Sept. 26, 2019).  Indeed, "ERISA commands undivided loyalty to the plan participants." *Id.* (quoting *Bedrick by & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996)).

To state a claim for breach of the duty of loyalty, "a plaintiff must allege facts that permit a plausible inference that the defendant engaged in transactions involving self-dealing or in transactions that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests."  *Cassell*, 285 F. Supp. 3d at 1062.  "In other words, to implicate the concept of loyalty, a plaintiff must allege plausible facts supporting an inference that a fiduciary acted *for the purpose of* providing benefits to itself or some third party."  *Id.*  It is not enough to "merely reincorporate alleged breaches of the duty of prudence as disloyal acts."  *Disselkamp*, 2019 WL 3536038, at *10.  Thus, numerous courts have dismissed loyalty claims despite the fact that the plaintiffs had alleged a breach

17

of the duty of prudence based on the payment of excessive fees when there were insufficient allegations regarding self-dealing. *See id.* ("Review of the Amended Complaint discloses that the disloyalty claim asserted in this count is merely derivative of the imprudence claim discussed above. Nowhere do Plaintiffs allege that the Plan's fiduciaries were engaged in self-dealing with respect to the administrative fees."); *Cassell*, 285 F. Supp. 3d at 1062-63 (dismissing claim for breach of the duty of loyalty because "[t]he facts alleged in the Amended Complaint assert that Defendants failed to manage and make decisions for the Plan in a prudent manner, not that Defendants engaged in self-dealing or acted for the purpose of benefitting a third party"); *Tracey v. Massachusetts Inst. of Tech.*, No. 16-11620-NMG, 2017 WL 4478239, at *2-3 (D. Mass. Oct. 4, 2017) (dismissing claim for violation of the duty of loyalty as speculative, but permitting claim of violation of the duty of prudence based on excessive management fees to proceed).

Here, while Plaintiffs have adequately stated a claim for breach of the duty of prudence with respect to the Plan's administrative fees, they have failed to allege facts supporting their claim for breach of the duty of loyalty that raise it above the speculative level. The only allegations that support Plaintiffs' claim independent of their allegations with respect to the excessiveness of the Plan's administrative fees are that Key and Alight have a "close relationship" and that Alight also administers Key's pension plan, Key's retiree medical plan, and KeyBank's online HR portal, all of which Key pays for independently of the Plan. (Doc. No. 17 at ¶ 44.) From this, Plaintiffs assert it is reasonable to infer that Defendants allowed participants to be charged excessive administrative fees in exchange for discounts on the other services. (*See id.* at ¶ 47.) However, Plaintiffs have not alleged that Alight actually gave Key favorable rates on any of those other services or even that the Plan's fees were negotiated in connection with the fees for those other services. Thus, there is no

indication that Defendants received any benefit in exchange for paying Alight a higher rate for the Plan's administrative services. Even taking into account Plaintiffs' potential lack of access to inside information, to assume that Defendants engaged in self-dealing without additional factual allegations is too speculative.[5] Consequently, the Court grants Defendants' Motion to Dismiss with respect to Plaintiffs' claim for breach of the duty of loyalty in this regard.

### ii. Managed Account Fees

Next, Plaintiffs allege that Defendants breached their duty of prudence by permitting the Plan to pay excessive amounts for managed account services, as other similarly sized plans paid significantly lower rates for the same Financial Engines managed account service, both when offered through Alight as an intermediary and through other recordkeepers. (Doc. No. 17 at ¶¶ 54-59.) Defendants move to dismiss this claim, asserting that Plaintiffs' comparisons are inapt for several reasons. First, Defendants contend that when participants are defaulted or automatically enrolled in managed accounts, then the rates typically are lower than when participants must opt-in to managed accounts. (Doc. No. 19-1 at 10-11.) Defendants point out that Plaintiffs have not alleged that the other plans were structured in the same manner in this regard as Key's Plan. (*Id.*) Second, Defendants assert that two of the plans that Plaintiffs use as a basis for comparison are much larger than Key's Plan, meaning they could negotiate better rates. (*Id.* at 11-12.) Finally, Defendants argue that by only comparing the plans' managed account rates—and nothing else—Plaintiffs have failed to show

---

[5] The Court finds the cases relied on by Plaintiffs in support of their breach of loyalty claim distinguishable and ultimately unpersuasive. For example, Plaintiffs cite *Reetz v. Lowe's Companies, Inc.*, 5:18-CV-00075-KDB-DCK, 2019 WL 4233616 (W.D.N.C. Sept. 6, 2019) in support of their argument that Defendants' relationship with Alight is sufficient to plausibly infer a breach. (Doc. No. 21 at 19.) However, the factual circumstances of that case were quite different. There, the plaintiffs alleged that the defendants replaced eight plan funds with an underperforming fund offered by the plan's investment consultant, who was also responsible for providing advice on executive compensation to defendants, permitting an inference that executives may have wanted to curry favor with the consultant by selecting its fund. *Reetz*, 2019 WL 4233616, at *5.

that the overall fee structure for all of the services provided by Alight was unreasonable.  (*Id.* at 12.)
Plaintiffs dispute each of these points and generally assert that the comparisons are valid given that
Plaintiffs have benchmarked the Plan's managed account fees against the same Financial Engines
service offered to similar plans and in some cases through the same recordkeeper.  (Doc. No. 21 at
11-13.)[6]  Applying the same standard for breach of the duty of prudence described above, the Court
finds Plaintiffs' allegations sufficient to state a claim.

Plaintiffs' allegations provide a strong benchmark that indicates the Plan's managed account
fees were excessive.  To provide managed account services to the Plan's participants, the Plan used
its recordkeeper, Alight, as an intermediary who then employed Financial Engines as a sub-adviser.
(Doc. No. 17 at ¶ 53.)  Plaintiffs have alleged that plans using the same managed account provider,
Financial Engines, through the same recordkeeper, Alight, charged participants significantly less for
managed account fees.  (*Id.* at ¶ 54.)  Indeed, the fees in the JCPenney 401(k) Savings Plan were
almost twice as high as the fees charged across participants' varying levels of assets by the Plan.  (*See
id.* at ¶ 55 (table)).  Further, Plaintiffs compared the Plan's managed account service to the same
Financial Engines managed account service with a different recordkeeper as the intermediary,
Vanguard, which similarly had reduced rates.  (*Id.* at ¶ 58.)  Finally, in July 2020, shortly after the
original Complaint was filed, Key switched recordkeepers and its managed account service fees
significantly decreased as well.  (*Id.* at ¶ 54 n.11.)

---

[6] Plaintiffs also once again offer evidence from outside of the pleadings in the form of the comparator plans' publicly
available Forms 5500 to argue that those plans used an opt-in method for their managed account service just like Key's
Plan.  (Doc. No. 21 at 12 n.20.)  As before, Plaintiffs offer no support as to why the Court can consider such materials at
the motion to dismiss stage, and the Court will disregard them.

20

The Court finds Defendants' challenges to these comparisons unpersuasive at this stage of the litigation. While Defendants contend that two of the plans offered by Plaintiffs as comparators were significantly larger than Key's Plan, Defendants do not dispute that the three remaining plans identified in the Amended Complaint as comparators are of similar size. In addition, although Defendants contend Plaintiffs' isolated comparisons of the rates for managed accounts do not show that the overall fees paid to Alight were unreasonable, Plaintiffs have alleged that the administrative service fees paid to Alight also were excessive. Thus, it is reasonable to infer that the higher managed account rates paid to Alight were not in exchange for discounts on other services provided by Alight to the Plan. Finally, although Plaintiffs have not alleged in their Amended Complaint that the comparator plans were structured in the same way as Key's Plan with respect to whether participants were defaulted into managed accounts or had to opt in, as noted above, Plaintiffs are not required to rebut "all possible lawful explanations for a defendant's conduct." *Braden*, 588 F.3d at 596.

Consequently, the Court concludes Plaintiffs have pled sufficient facts showing that the Plan's managed account fees were unreasonable, and, as a result, it can be reasonably inferred that there was a flaw in Defendants' processes with respect to monitoring and negotiating the amounts paid by the Plan for its managed account service. Defendants' Motion to Dismiss is denied in this respect.

### iii. MaGIC Fund

#### 1. Duty of Prudence

In their Amended Complaint, Plaintiffs also assert that Defendants breached their fiduciary duty of prudence by selecting and retaining a proprietary stable value fund for the Plan, the MaGIC Fund, when superior options were available. (Doc. No. 17 at ¶¶ 60-65.) Defendants contend that Plaintiffs' allegations fail to state a claim in this regard because Plaintiffs improperly rely on hindsight

21

to argue that Defendants should have selected better performing funds and that the slight variance in performance between the MaGIC Fund and Plaintiffs' proposed comparators does not give rise to the inference that a reasonable fiduciary would have avoided the MaGIC Fund altogether. (Doc. No. 19-1 at 13-15.) Defendants also assert that Plaintiffs have not established that the MaGIC Fund underperformed at all, arguing that the MaGIC Fund has provided steady returns and outperformed its benchmarks in the Plan's disclosures and that Plaintiffs have not shown that the comparator funds applied the same investment strategy. (*Id.* at 16-18.) In opposition, Plaintiffs argue their allegations that the MaGIC Fund has higher overall fees than other stable value funds and has consistently underperformed other stable value funds over the last ten years—combined with the lack of investment in the MaGIC Fund by other similarly sized plans, the high percentage of the MaGIC Fund held by the Plan, and Defendants' self-interest to retain the fund—are sufficient to state a claim. (Doc. No. 21 at 13-17.) The Court concludes that Plaintiffs have failed to adequately state a claim for breach of the duty of prudence with respect to the Plan's investment in the MaGIC Fund.

As noted above, ERISA requires the fiduciaries of a plan to act prudently in managing the plan's assets. *Pfeil*, 806 F.3d at 383. Part of the duty of prudence under ERISA is a duty to exercise prudence in selecting investments, as well as a continuing duty to monitor investments and remove imprudent ones. *See Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). To establish that a fiduciary has violated these duties, "the plaintiff must allege facts establishing that the fiduciary's investment decisions—in the conditions prevailing at the time, and without the benefit of hindsight—are such that a reasonably prudent fiduciary would not have made that decision as part of a prudent, whole-portfolio, investment strategy that properly balances risk and reward, as well as short-term and long-term performance." *Birse v. CenturyLink, Inc.*, No. 17-cv-02872-CMA-NYW, 2019 WL 1292861,

22

at *3 (D. Colo. Mar. 20, 2019). Thus, while plaintiffs need not plead facts "relating directly to the methods employed by the ERISA fiduciary," they must "allege[] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *St. Vincent*, 712 F.3d at 718 (citation omitted); *see also Birse*, 2019 WL 1292861, at *4 ("[T]o plausibly establish a claim for a breach of duty to monitor, a plaintiff must allege facts plausibly establishing that no reasonable fiduciary would have maintained the investment.").

For example, "allegations of consistent, ten-year underperformance may support a duty of prudence claim." *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019). However, "the underperformance must be substantial." *Id.* To illustrate, in *Patterson*, the plaintiffs alleged that the challenged fund had an average annual return of 7.42%, while its benchmark had an average annual return of 8.16% over the same ten-year period. *Id.* The court held that "such a small disparity in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap Fund in the set of Plan offerings." *Id.* Similarly, in *Birse*, the plaintiffs alleged that the challenged fund underperformed its benchmark by an average of 2.11% for six years, and that had the defendant replaced the fund with another, class members would have realized 5% higher returns on their investment. 2019 WL 1292861, at *5. The court dismissed the plaintiffs' claim for breach of the fiduciary duty of prudence, holding the plaintiffs "improperly rel[ied] on hindsight to allege [the defendant] should have offered a better performing fund rather than indicating how an investigation would show an improvident process." *Id.* The court also noted that the plaintiffs "cite[d] allegedly similar cases that have survived dismissal, but Plaintiffs fail[ed] to explain that the complaints at issue in those cases contained very different

23

allegations and involved funds that performed much lower than the Fund's 2–3% underperformance." *Id.* at *5 n.2.

In this case, Plaintiffs allege that there were better stable value fund options than the MaGIC Fund in the marketplace that would have generated greater returns.  (Doc. No. 17 at ¶ 63.) Specifically, Plaintiffs point out that over the past ten years, the MaGIC Fund has averaged an annual return of 2.06%, while during that same timeframe, fourteen other stable value accounts had a composite average of an annual return of 2.57%.  (*Id.* at ¶ 64.)  Plaintiffs also allege that these funds outperformed the MaGIC Fund in nine of the ten years.  (*Id.*)  Thus, the Plaintiffs' self-selected stable value funds only outperformed the MaGIC Fund by half a percentage point over the last ten years. As other courts have concluded, such a small difference in performance does not support an inference that no reasonable fiduciary would have retained the MaGIC Fund, especially when the MaGIC Fund performed better than the comparator funds in one of the relevant years.  Moreover, Plaintiffs have not alleged that the MaGIC Fund underperformed any benchmark disclosed to Plan participants.[7]

These facts distinguish the instant matter from several of the cases relied on by Plaintiffs in which the challenged fund either underperformed more substantially or underperformed the benchmark listed in its prospectus rather than funds selected by the plaintiffs.  *See, e.g.*, *Karpik*, 2019

---

[7]  Relying on information in the Plan's fee disclosures from 2015 to 2020 that were attached as exhibits to Defendants' Motion to Dismiss, Defendants assert that the MaGIC Fund actually outperformed its benchmark as disclosed to Plan participants every year.  (Doc. No. 19-1 at 16.)  Defendants assert the Court may consider this information because Plaintiffs expressly refer to and rely on the Plan's fee disclosures in their Amended Complaint.  (*Id.* at 3 n.2.)  On a motion to dismiss, courts "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  However, courts generally will not consider the content of any exhibits attached to a motion to dismiss for the truth of the matters asserted therein or to decide any facts in dispute.  *See In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 747 n.2 (N.D. Ohio 2020).  Thus, the Court will not consider this additional factual information from the Plan's fee disclosures.

WL 7482134, at *5 (denying motion to dismiss where the challenged fund "dramatically underperformed the market" and "was ranked last by Morningstar out of 927 funds"); *Miller v. AutoZone, Inc.*, No. 2:19-cv-02779-MSN-tmp, 2020 WL 6479564, at *5-7 (W.D. Tenn. Sept. 18, 2020) (denying motion to dismiss where plaintiffs alleged, among other things, that the crediting rate of the challenged fund was 2.20% less than that of a comparator); *Karg v. Transamerica Corp.*, No. 18-CV-134-CJW-KEM, 2019 WL 3938471, at *7 n.5 (N.D. Iowa Aug. 20, 2019) ("[P]laintiffs' allegations regarding the challenged funds' underperformance compared to select available funds and the relevant benchmark indices throughout the putative class period state a facially plausible claim that defendants breached their duty of prudence.").  Indeed, Plaintiffs have not identified any cases in which a court found that the plaintiff sufficiently pled a claim based on such a small disparity in performance.

Further, while Plaintiffs have pled that some similarities existed between the MaGIC Fund and the fourteen comparator funds—namely, that they were each stable value accounts with at least $50 million in assets that were managed using similar targets for duration and credit quality of the underlying fixed income securities (Doc. No. 17 at ¶ 64)—they have not fully demonstrated that the funds all had the same investment strategy, which might account for the small difference in returns without any correlating breach of fiduciary duty.  *See, e.g.*, *Barchock v. CVS Health Corp.*, 886 F.3d 43, 50 (1st Cir. 2018) ("[C]onservativism in the management of a stable value fund—when consistent with the fund's objectives disclosed to the plan participants—is no vice.").

In addition to pointing to the MaGIC Fund's performance, Plaintiffs argue that the fund's higher fees demonstrate it was imprudent for Defendants to retain the fund.  (Doc. No. 21 at 17.) However, Plaintiffs offer only conclusory allegations in this regard in their Amended Complaint,

alleging that the "MaGIC fund's modest overall asset base provides little leverage in negotiating a favorable wrap contract with the insurer, resulting in higher overall fees for the fund and lower returns for investors," and that "[t]here were far better stable value fund options with billions of dollars in assets at comparable levels of risk that were available in the marketplace and would have generated greater returns and lower underlying wrap fees for participants." (Doc. No. 17 at ¶ 63.) Plaintiffs do not provide the amount of fees charged by the MaGIC Fund, specify how much higher they were than comparator funds, or identify any specific comparator funds with lower fees in the market. As such, the Court agrees with Defendants that Plaintiffs have not established a sufficient benchmark to support their prudence claim showing the fees charged by the MaGIC Fund were unreasonably high. *See Meiners*, 898 F.3d at 823; *Patterson*, 2019 WL 4934834, at *12.

In support of their claim that the MaGIC Fund was an imprudent investment, Plaintiffs also cite to the high percentage of the MaGIC Fund held by the Plan and the fact that plans that are similar in size to Key's Plan have not invested in the Fund. (Doc. No. 21 at 17.) Specifically, Plaintiffs allege that the Plan has invested approximately $170 million into the MaGIC Fund, which is nearly one third of the fund's approximately $600 million in assets, and that the next largest plan that has invested in the fund has less than $250 million in assets—compared to the Plan's $2.9 billion—and has invested only $11 million in the MaGIC Fund. (Doc. No. 17 at ¶¶ 21, 62.) However, these allegations still show that over two thirds of the MaGIC Fund's assets came from other plans. This tends to undermine Plaintiffs' assertion that an investigation would have revealed that the investment was imprudent or that no reasonable fiduciary would have invested in the MaGIC Fund, given that the majority of assets in the fund come from other investors. Nor do Plaintiffs explain why large plans that did not invest in the MaGIC Fund are better able to assess the prudence of investing in the

fund than smaller plans or allege that smaller plans were prevented from investing in the preferred comparator funds selected by Plaintiffs such that they were forced into the MaGIC Fund.

Finally, Plaintiffs assert Defendants' self-interest to maintain the Plan's investment in the MaGIC Fund also support an inference of imprudence.  (Doc. No. 21 at 17.)  Although there is no blanket prohibition on employers including proprietary funds in their 401(k) plans, courts have recognized that allegations that defendants retained underperforming proprietary funds in order to benefit themselves may support an inference that the decision-making process was flawed.  *See Karpik*, 2019 WL 7482134, at *4-5.  However, "[a]bsent any well-pled factual allegations that . . . funds were an imprudent choice, no inference can be reasonably drawn that . . . Defendants retained those funds (or made them default investments) out of improper motives."  *Meiners*, 898 F.3d at 824. For example, in *Meiners*, the plaintiff alleged that the defendants selected their own proprietary funds to provide financial support for the underperforming funds.  *Id.* at 821.  But the plaintiff failed to adequately allege that the funds were an imprudent choice.  *Id.* at 824. As a result, the court held that it could not "reasonably infer [the defendants] acted out of a motive to seed underperforming or inordinately expensive funds if [the plaintiff] has not plausibly pled that those funds were, in fact, underperforming or inordinately expensive."  *Id.*; *see also Patterson*, 2019 WL 4934834, at *12 (dismissing claim alleging fiduciary "disloyally retained . . . poorly-performing proprietary funds" to generate fees because the plaintiffs failed to plausibly allege that the proprietary funds charged excessive fees or were otherwise imprudent investments).

Likewise, here, Plaintiffs allege that Defendants used the Plan to prop up the MaGIC Fund (Doc. No. 17 at ¶ 62), but have failed to adequately allege that the MaGIC Fund substantially underperformed or that it charged excessive fees.  As such, the Court cannot infer an ulterior motive

27

for Defendants' decision to retain the MaGIC Fund.  Moreover, Plaintiffs have not specifically alleged how Defendants actually benefitted from the Plan's investment in the fund.  In their opposition brief, Plaintiffs argue that Defendants benefit from the "spread" on the MaGIC fund—the difference between the rate of return offered to investors in the fund and the rate of return earned by Key on the underlying investments—which functions as an implicit fee. (Doc. No. 21 at 18.)  But as Defendants point out, this allegation was not included in the Amended Complaint.  Thus, the proprietary nature of the MaGIC Fund also provides little support for Plaintiffs' prudence claim.

Even considering all of Plaintiffs' allegations together, Plaintiffs have failed to allege sufficient facts from which the Court can infer that an adequate investigation would have revealed to a reasonable fiduciary that investment in the MaGIC Fund was improvident.  Therefore, Defendants' Motion to Dismiss is granted with respect to Plaintiffs' prudence claim with regard to the Plan's investment in the MaGIC Fund.

## 2.  Duty of Loyalty

Plaintiffs also allege that Defendants' decision to retain the MaGIC Fund was a breach of their duty of loyalty.  (Doc. No. 17 at ¶ 65.)  Defendants argue that dismissal of this claim is appropriate because Plaintiffs have not plausibly alleged that the MaGIC Fund underperformed such that improper motives may not be inferred from Defendants' conduct and because Plaintiffs have failed to allege that Defendants stood to gain from offering the MaGIC Fund to Plan participants.  (Doc. No. 19-1 at 18-19.)  Conversely, Plaintiffs contend that based on the facts alleged, the only logical explanation for retaining the MaGIC fund in the Plan is that doing so benefitted Key.  (Doc. No. 21 at 18.)  They also argue that Defendants are not charitable organizations, and that they benefited from the Plan's investment in the MaGIC Fund based on the implicit fee discussed above.  (*Id.*)

28

For the same reasons described above with respect to Plaintiffs' prudence claims, the Court finds that Plaintiffs' conclusory allegation that Defendants acted to prop up the MaGIC Fund is not sufficient to reasonably infer that Defendants acted for the purpose of benefitting themselves when Plaintiffs have failed to plausibly allege that the MaGIC Fund was inordinately expensive or underperformed. *See Meiners*, 898 F.3d at 824. Moreover, as noted above, Plaintiffs have also failed to specifically allege the way in which Defendants benefited from including the MaGIC Fund in the Plan. Thus, Defendants' Motion to Dismiss is granted as to Plaintiffs' loyalty claim with respect to the MaGIC Fund.

### b. Count II

Finally, in Count II of their Amended Complaint, Plaintiffs allege that Key is liable for the failure to properly monitor other fiduciaries, specifically the Committee and its members. (Doc. No. 17 at ¶¶ 82-88.) Key asserts dismissal of this claim is appropriate for two reasons. First, Key asserts that a failure to monitor claim is derivative of other breach of fiduciary duty claims, and Plaintiffs' claim therefore must be dismissed because they have failed to adequately allege any other breaches of fiduciary duty. (Doc. No. 19-1 at 20.) Because the Court has already found that Plaintiffs have adequately pled at least some of their other claims, this argument fails. Second, Key asserts that Plaintiffs' allegations in support of their monitoring claim are conclusory because they do not identify any inadequate appointees or offer any detail about Key's process for monitoring appointees—let alone how that process was flawed. (*Id.* at 19-20.) In response, Plaintiffs argue that they are not required to provide additional detail regarding the monitoring process at this time and that their monitoring allegations are almost identical to the type of allegations that have been found sufficient

in other cases.  (Doc. No. 21 at 20.)  The Court agrees, and, therefore, Key's Motion to Dismiss with respect to Plaintiffs' monitoring claim is denied.

"An appointing fiduciary . . . has an ongoing duty to monitor its fiduciary appointees."  *In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 863 (N.D. Ohio 2006); *accord McGinnes v. FirstGroup Am., Inc.*, No. 1:18-cv-326, 2021 WL 1056789, at *13 (S.D. Ohio Mar. 18, 2021) ("The 'ERISA statutory scheme imposes a duty to monitor upon fiduciaries when they appoint other persons to make decisions about the plan.'") (citation omitted).  "Monitoring should occur '[a]t reasonable intervals' and 'in such manner as may be reasonably expected to ensure that [ ] performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.'"  *McGinnes*, 2021 WL 1056789, at *13 (quoting 29 C.F.R. § 2509.75–8).

To state a claim for the failure to monitor, a plaintiff "need not directly assert actions by Defendants that demonstrate their failure to monitor to survive a motion to dismiss, so long as the Court can plausibly conclude from the surrounding factual circumstances that a violation occurred."  *Disselkamp*, 2019 WL 3536038, at *11.  Accordingly, multiple courts have found allegations that defendants failed to monitor and evaluate the performance of their appointees or failed to have a system in place for doing so, failed to monitor their appointees' fiduciary processes in a way that would have alerted them to the alleged fiduciary breaches, and failed to remove appointees whose performance was inadequate in that they continued to maintain excessively costly and poorly performing investments were sufficient to state a claim.  *See Karpik*, 2019 WL 7482134, at *9; *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 795 (N.D. Tex. 2017); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV 15-1614-JLS (JCGx), 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016).

Here, Plaintiffs' allegations are almost identical to the type of allegations that have been found sufficient in these other cases.  Specifically, Plaintiffs allege that Key was responsible for appointing and removing members of the Committee and that Key breached its fiduciary monitoring duties by:

    a.  Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

    b.  Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

    c.  Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly administrative services and managed account services and a poorly performing proprietary investment within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

(Doc. No. 17 at ¶¶ 84-86.)  Therefore, Plaintiffs have stated a cognizable failure to monitor claim, and Defendants' Motion to Dismiss is denied in this regard.

## IV.    Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss (Doc. No. 19) is GRANTED IN PART and DENIED IN PART, as follows.  Defendants' Motion to Dismiss is granted as to Plaintiffs' claims for the breach of the duty of loyalty with respect to the alleged payment of excessive administrative fees and for the breach of the duties of prudence and loyalty with respect to the MaGIC Fund, and denied in all other respects.

    **IT IS SO ORDERED.**

                      *s/Pamela A. Barker*
                      PAMELA A. BARKER
Date:  May 4, 2021        U. S. DISTRICT JUDGE